# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

DENISE MERRIMON and     )
BOBBY S. MOWERY,      )
                           )
         Plaintiffs,    )
                           )   Docket no. 1:10-CV-447-NT
v.                        )
                           )
UNUM LIFE INSURANCE    )
COMPANY OF AMERICA,    )
                           )
         Defendant    )

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
## AND CLASS CERTIFICATION

## I.    INTRODUCTION

Plaintiffs Denise Merrimon and Bobby S. Mowery are beneficiaries of group life insurance policies administered by the Defendant, Unum Life Insurance Company of America ("**Unum**"). These policies are governed by the Employee Retirement Income Security Act ("**ERISA**") and Maine state law. This case comes before the Court on the Plaintiffs' motion for partial summary judgment regarding Unum's liability for: (1) breach of plan provisions and fiduciary duty under ERISA, (2) breach of contract, and (3) breach of Maine's late payment statute, 24-A M.R.S.A. § 2436 (2010) (the "**Late Payment Statute**"). Unum files a cross-motion for summary judgment on these claims. For the reasons set forth below, the Plaintiffs' motion for partial summary judgment is GRANTED IN PART with respect to their ERISA claims and DENIED with respect to their breach of contract and late payment claims. Unum's motion for summary judgment is GRANTED with

respect to the Plaintiffs' claims for breach of contract and breach of Maine's late payment statute, but DENIED IN PART with respect to Plaintiffs' breach of fiduciary duty claim under ERISA.

The Plaintiffs also move to certify a class of similarly-situated plaintiffs including a subclass of beneficiaries whose policies are protected by the Late Payment Statute. Certification of the general class is GRANTED. Because the Court has granted Unum's motion for summary judgment on Plaintiffs' Maine state law claims, and because the subclass was based on those claims, certification of the subclass is unnecessary and is therefore DENIED.

## II.    FACTUAL BACKGROUND

The parties do not dispute any of the following facts, which were set forth by each side in their respective statements of material fact.   In 2001, Peabody Investments Corp. established group life insurance coverage through Unum for the benefit of its employees ("**Peabody Policy**"), and in 2003, St. Joseph's Hospital did the same ("**St. Joseph's Policy**"). Plaintiff Bobby S. Mowery was a designated beneficiary of a Peabody Policy, under which benefits of $62,300 were payable upon the death of his son. Plaintiff Denise Merrimon was a designated beneficiary of a St. Joseph's Policy, under which benefits of $51,000 were payable upon the death of her husband.

### A.  The Group Insurance Summaries of Benefits ("GISBs")

The parties agree that the GISBs are in all respects the relevant documents in this case. They are the contracts agreed to by the employers and Unum, and they

contain the relevant portions of these employers' ERISA plans. They were written by Unum to fulfill ERISA's requirements for summary plan descriptions. These GISBs contain two critical provisions governing when and how the beneficiaries will be paid upon the approval of a claim. The pertinent wording of the two policies is identical.

### 1.  When Benefits Would be Paid

In a section of the GISBs entitled "WHEN WILL YOUR BENEFICIARY RECEIVE PAYMENT?" the GISBs stated: "Your beneficiary(ies) will receive payment when Unum approves your death claim." *Peabody Policy Summary of Benefits,* p. 31 (Doc. # 33); *St. Joseph's Policy Summary of Benefits,* p. 30 (Doc. # 34).

### 2.  How Benefits Would Be Paid

In a section of the GISBs entitled "HOW WILL UNUM MAKE PAYMENTS?" the GISBs provided:

> If you or your dependent's life claim is at least $10,000, Unum will make available to the beneficiary a retained asset account (the Unum Security Account).

> Payment for the life claim may be accessed by writing a draft in a single sum or drafts in smaller sums. The funds for the draft or drafts are fully guaranteed by Unum.

> If the life claim is less than $10,000, Unum will pay it in one lump sum to you or your beneficiary.

> Also, you or your beneficiary may request the life claim to be paid according to one of Unum's other settlement options. This request must be in writing in order to be paid under Unum's other settlement options.

*Id.* at p. 17 (Doc. # 33); *id.* at p. 11 (Doc. # 34). A glossary to both GISBs defined the term "Retained Asset Account" (hereinafter "**RAA**") to mean "an interest bearing account established through an intermediary bank in the name of you or your beneficiary as owner." *Id.* at p. 40 (Doc. # 33); *id.* at p. 47 (Doc. # 34). No particular rate of interest, or formula or index for calculation of the rate of interest for the RAA is specified in this section or anywhere within the GISBs.

### B. Payment to Plaintiffs Mowery and Merrimon

Plaintiff Bobby S. Mowery's son died on or about September 23, 2007. On December 28, 2007, Mr. Mowery submitted a claim for death benefits, which was approved by Unum on January 4, 2007. That same day, Unum's contractor Open Solutions, Inc. ("**OSI**") mailed to Mr. Mowery a Welcome Kit which included information about the RAA established in his name, an opening statement, and a book of drafts to access the funds in an account at State Street Bank (the "**Bank**"). The drafts could be written for any amount over $250. In the Welcome Kit, Unum stated that it would credit interest to the account at 1% per year beginning January 4, 2008. It also stated, "If at any time after your account is established the available balance in your account falls below $250, it will be closed automatically. The balance remaining in the account will be sent to you, together with any interest due, after the 5th day of the following month."

Between January 12, 2008 and January 18, 2008, Mr. Mowery wrote out five drafts in the total amount of $62,304.51. He paid off his mortgage, two student loans, and the balance of the bill for his son's funeral, and then he transferred the

balance of the account into his investment account. On February 5, 2008, because the account balance had fallen below the required minimum balance of $250, State Street Bank closed Mr. Mowery's account and sent him a treasurer's check in the remaining amount of $19.13. In total, Unum paid Mr. Mowery $62,323.64, representing the full principal benefit plus $23.64 in accrued interest.

Plaintiff Denise Merrimon's husband died on or about July 13, 2007. Ms. Merrimon first contacted Unum about the death benefit due to her on August 3, 2007. Unum approved Ms. Merrimon's claim on September 10, 2007. Although Plaintiffs do not press the issue, Unum has explained that it did not immediately approve Ms. Merrimon's claim because it lacked the required claim form, death certificate, and beneficiary designation form. Unum further explained that it contacted St. Joseph's Hospital several times between August 3, 2007 and September 6, 2007, when it learned that St. Joseph's had closed due to bankruptcy. Although it did not have a beneficiary designation form, on September 10, 2007, Unum approved Ms. Merrimon's claim as the individual to whom the death benefit was payable in the absence of a beneficiary designation form.

On September 10, 2007, OSI mailed Ms. Merrimon a Welcome Kit which contained the same information and features as Mr. Mowery's kit. On November 13, 2007, Ms. Merrimon wrote out a single draft to herself in the amount of $51,036.34 and deposited that check into her personal checking account. On December 5, 2007, because the balance in Ms. Merrimon's RAA had fallen below $250, the Bank closed her account and sent her a treasurer's check in the remaining amount of $53.19. In

total, Unum paid Ms. Merrimon $51,089.53, representing the full principal benefit plus $89.53 in interest.

### C. How the RAAs Work

No funds are actually placed into the RAAs when they are initially opened. Instead, Unum retains and continues to invest the amounts due under the approved claims until a draft is presented to the Bank for payment. When a draft is presented for payment, funds sufficient to cover the draft are transferred from Unum's general accounts to the Bank.

Unum acknowledges that the RAAs it creates under these contracts bear interest at a rate selected by Unum or its agents, and that Unum and its agents retain the right to change the applicable interest rate. A committee at Unum meets periodically to recommend the interest rate that will apply to its RAAs. The rate is set by analyzing the interest rates used by banks for money market accounts and certificates of deposit as well as interest rates applied to RAAs created by other insurance companies. Since October 28, 2004, Unum has set the interest rate for its RAAs at 1%. Among the factors that Unum considered in setting and keeping this rate since 2004 were the rate at which beneficiaries would draw down their accounts to place the funds into higher-yield accounts (thus depriving Unum of the benefit of continuing to invest the funds backing the accounts), and whether higher interest rates on RAAs offered by other insurers would cause Unum to lose business. According to Unum's research, as of June, 2008 other insurers offered an average rate of about 2% on their RAAs, with some as high as 4%.

RAAs provide Unum an opportunity for earnings on the "interest spread," which is the difference between the income Unum earns from investing the funds backing the RAAs and the amount of interest it pays to beneficiaries on these accounts. The creation of RAAs is also intended to give beneficiaries time to recover from their loss before making a decision about what to do with their benefits.

## III.    PROCEDURAL BACKGROUND

On October 29, 2010, the Plaintiffs filed a three-count suit against Unum alleging: (1) that Unum breached the applicable plans as well as its fiduciary duties to them under ERISA by retaining and investing the funds backing their RAAs; (2) that Unum breached its contracts with them by failing to pay post-mortem interest as required by Maine state law, which law is incorporated into the relevant policies; and (3) that Unum is liable to them under Maine's late-payment statute, 24-A M.R.S.A. § 2436, for overdue interest at a rate of 1.5% per month (18% per annum). On March 10, 2011, the Court granted the Plaintiffs leave to file an amended complaint (Doc. # 19), which retained these three counts.

On June 14, 2011, the Plaintiffs filed a motion for partial summary judgment on liability (Doc. # 25) and a motion to certify a class (Doc. # 29). Unum filed a cross-motion for summary judgment (Doc. # 26). By agreement of the parties, several documents in the record were sealed from public view, and, on July 14, 2011, a consent confidentiality order was entered by the Court (Doc. # 45). Following responses and replies from both sides on all motions, Unum filed a request for oral argument (Doc. # 55), which the Court granted. Oral argument was held on January

19, 2012. Thereafter, the parties submitted their positions to the Court regarding the possibility of a stay and/or an interlocutory appeal of this case to the First Circuit. On January 30, 2012, the Court held a telephonic conference with the parties on this issue.

## IV.   STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment is authorized "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

On summary judgment, the Court reviews the record together with all reasonable inferences therefrom in the light most favorable to the non-moving party. *See Johnson v. Educ. Testing Serv.,* 754 F.2d 20, 25 (1st Cir. 1985), *cert. denied,* 472 U.S. 1029, 105 S. Ct. 3504, 87 L. Ed. 2d 635 (1985). Only those facts in dispute that might affect the outcome of the suit under the governing law will bar the entry of summary judgment. Factual disputes which are irrelevant or unnecessary will not be considered. *See Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To determine whether a dispute as to a material fact is genuine, the Court must decide whether the "evidence is such that a reasonable [fact-finder] could return a verdict for the non-moving party." *Id.*

As to issues on which the movant would be obliged to carry the burden of proof at trial, the movant must initially proffer record materials that support his position. *See In re Varrasso*, 37 F.3d 760, 763 (1ˢᵗ Cir. 1994) (citations omitted). This means that summary judgment is inappropriate if inferences are necessary for the judgment and those inferences are not mandated by the record. *Id.* (citing *Blanchard v. Peerless Ins. Co.,* 958 F.2d 483, 488 (1st Cir. 1992) (warning that summary judgment is precluded "unless no reasonable trier of fact could draw any other inference from the 'totality of the circumstances' revealed by the undisputed evidence."))

As to issues on which the non-movant has the burden of proof, the movant need do no more than aver "an absence of evidence to support the nonmoving party's case." *Blanchard,* 958 F.2d at 488 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). The burden of production then shifts to the non-movant, who, to avoid summary judgment, must establish the existence of at least one question of fact that is both "genuine" and "material." *Id.* (citing *Anderson,* 477 U.S. at 248).

## B. Class Certification

Federal Rule of Civil Procedure 23 sets forth the substantive criteria for certifying a class. While the First Circuit has not articulated a particular level of proof or a set standard for the Court regarding findings relating to the substantive criteria, it has cautioned that "when a Rule 23 requirement relies on a novel or complex theory as to injury . . . the district court must engage in a searching inquiry

into the viability of that theory and the existence of the facts necessary for the theory to succeed." *In re: New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 26 (1ˢᵗ Cir. 2008).

## V.     ANALYSIS

### A. The ERISA Claims

The Plaintiffs claim that Unum has a fiduciary duty to use the life insurance benefits due to the Plaintiffs solely to benefit them and not to use those assets for its own interest. The crown jewel in the Plaintiffs' argument is a First Circuit case which held, on similar though not identical facts, that an RAA "was no more than an IOU which did not transfer the funds to which the beneficiaries were entitled out of the plan assets and hence UNUM remained a fiduciary with respect to those funds." *Mogel v. Unum Life Ins. Co.,* 547 F.3d 23, 27 (1ˢᵗ Cir. 2008). Unum counters that the present case is distinguishable from *Mogel*, which dealt with policies that promised lump sum payments as opposed to policies which promised RAAs. Unum points to a Second Circuit case, *Faber v. Metropolitan Life Ins. Co.*, 648 F.3d 98 (2d Cir. 2011), and a recent advisory opinion from the Department of Labor ("**DOL Opinion**"), (Doc. # 26-2). Both the *Faber* decision and the DOL Opinion conclude that an insurance company discharges its ERISA obligations when it furnishes a beneficiary an RAA in accordance with the terms of a life insurance policy, and it does not retain plan assets by holding and managing the funds that back the RAA.

## 1.  The Pertinent Provisions of ERISA

The group life insurance policies at issue are "employee welfare benefit plans" governed by ERISA. *See* 29 U.S.C. § 1002(1) (2009). ERISA provides:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

Particular fiduciary duties under ERISA are stated in Section 404(a) and 406(b).  Section 404(a) provides: "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and – (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries…" 29 U.S.C. § 1104(a)(1).  Section 406(b) provides: "[a] fiduciary with respect to a plan shall not – (1) deal with the assets of the plan in his own interest or for his own account…" 29 U.S.C. § 1106(b)(1).

## 2.  Unum's Fiduciary Status

The threshold question to determine liability under ERISA is whether Unum was acting as a fiduciary when it opened and maintained RAAs for the beneficiaries. Under ERISA's fiduciary definition, Unum could have acted as a fiduciary if it exercised:

- any discretionary authority or discretionary control with respect to the management of the plan;
- any authority or control with respect to the disposition of the assets of the plan; or

- any discretionary authority or discretionary responsibility in the administration of the plan.

Unum argues that because the plan has no ownership interest in the payment due after a death benefit is approved, the moneys owed to the beneficiaries are not plan assets, and therefore Unum has no fiduciary obligation with regard to them. Relying on *Mogel*, the Plaintiffs claim that benefits payable to ERISA plan beneficiaries are plan assets and remain so until they are actually paid through the banking system. *See Mogel,* 547 F.3d at 26 ("the sums due Plaintiffs remain plan assets subject to UNUM's fiduciary obligations until actual payment.") The Plaintiffs also argue, however, that Unum's fiduciary obligations would continue as long as it managed and administered the RAAs *regardless* of whether the funds backing the RAAs were plan assets. *See id.* at 27 (citing 29 U.S.C. § 1002(21)(A)(i) and (iii)). Unum counters that its last discretionary fiduciary act is determining whether the Plaintiffs' claims are payable, and that its relationship with the Plaintiffs thereafter is strictly a contractual debtor-creditor relationship.

### a. Control of Plan Assets

Under ERISA, there is no general definition of "plan assets," but only an indication of what are not "plan assets." Under the guaranteed benefit policy exemption insurers who provide policies for "guaranteed benefits" — *e.g.* life insurance policies stating a specific pre-defined payout upon the death of a plan participant such as the ones at issue in this case — are allowed the freedom to invest the proceeds of the premiums on such policies as they see fit without the restrictions otherwise imposed upon fiduciaries under ERISA. Under this exclusion,

the policies themselves are considered the "plan assets," however the assets backing the benefits guaranteed under the policies are not "plan assets." *See* 29 U.S.C. § 1101(b)(2).

*Mogel* is clear that the guaranteed benefit exemption is no longer applicable once Unum approves the death claim and the beneficiaries' rights to payment vest. *Mogel*, 547 F.3d at 27 ("once an insured's death occurs, we are no longer concerned with the management of plan assets in an insurance company's general account (which is all the guaranteed benefit exemption covers)"). The critical question is whether the proceeds due to beneficiaries *become* plan assets once the insured dies and the benefit is approved.

*Mogel* concludes, without much discussion, that "the sums due plaintiffs *remain* plan assets subject to UNUM's fiduciary obligations until actual payment." *Id.* at 26. Unum points out, persuasively, that the Seventh Circuit decision in *Commonwealth Edison Co. v. Vega*, 174 F.3d 870, 872-73 (7th Cir. 1999), which the First Circuit cited in support of its conclusion, dealt not with an ERISA defined-benefits plan, but rather with a ERISA retirement plan, which began with a pool of funds that were themselves plan assets. In *Vega*, checks cut to beneficiaries were drawn from funds that were always plan assets and that *remained* so until the checks were presented to the plan for payment. *See id.* In this case, the funds due would have to somehow *become* plan assets following approval of the claim.

*Faber,* following the DOL Opinion, concludes that the amounts due the beneficiaries do not *become* plan assets because the plans "do not have an ownership

interest – beneficial or otherwise – in them." 648 F.3d at 106 (citing DOL Opinion at pp. 9-10 (Doc. # 26-2)). Indeed, it is difficult to understand how these amounts, which must be drawn from Unum's general account where they have been sitting under the guaranteed benefit exemption up to the time of claim approval, would *become* plan assets when following the approval of the death benefit they become due directly to the beneficiaries.

The First Circuit in *Mogel* may have been interpreting ERISA's "disposition of [the plan's] assets" language broadly to mean disposition of the policies themselves. Once the policies, which all agree are plan assets, become due and payable to beneficiaries, the insurer must dispose of those policies by paying the claims due. Perhaps the First Circuit was saying that until whatever payment promised under the plan is in the hands of the beneficiaries, the insurer has not met its fiduciary obligation to dispose of the plan assets, *i.e.* the policies.

It is also possible that the First Circuit was adopting a functional test to determine whether the funds due beneficiaries were "plan assets." The "functional" approach to determining plan assets was articulated by the Ninth Circuit in *Acosta v. Pac. Enters.*, 950 F.2d 611, 620 (9th Cir, 1992). Under this approach, "to determine whether a particular item constitutes an 'asset of the plan' it is necessary to determine whether the item in question may be used to the benefit (financial or otherwise) of the fiduciary at the expense of plan participants or beneficiaries." *Id.* *Mogel* pointed out that Unum was the party enjoying the use of the funds. *Mogel*, 547 F.3d at 26 ("Until a beneficiary draws a check on the Security Account, the

funds represented by that check are retained by UNUM and UNUM had the use of the funds for its own benefit. To say that the funds are 'deemed to belong' to the beneficiaries obscures the reality that UNUM had possession of them and enjoyed their use.") While the functional test may in many situations be a useful analysis, it results in somewhat circular logic in this case. It only appears that Unum used the amounts owed to Plaintiffs at their "expense" if one views them as plan assets to begin with. Furthermore, if the funds owed to the Plaintiffs are considered plan assets, the result will be an end to the RAA method of payment because insurers will be required to immediately cease investment of and segregate the funds due to beneficiaries. For reasons articulated in Section V(A)(3) *infra*, the Court finds this to be a drastic result which is not required by ERISA.[1]

*Mogel's* core holding – that Unum's "disposition to the beneficiaries of benefits under the plan falls comfortably within the scope of ERISA's definition of fiduciary duties with respect to plan administration" – did not require the First Circuit to find that the sums due to those plaintiffs were plan assets.[2] *Mogel*, 547

---

[1] The Court has also considered the opinions in *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 777 F. Supp. 2d 869 (E.D. Pa. 2011) (denying defendant's motion to dismiss), *Otte v. Life Ins. Co. of N. Am.*, 275 F.R.D. 50 (D. Mass. 2011) (certifying a Rule 23(b)(3) class of plaintiffs), and *Vander Luitgaren v. Sun Life Ins. Co. of Can.*, 2010 WL 4722269 (D. Mass.) (denying defendant's motion to dismiss). Only *Edmonson* contains an analysis of whether the funds backing the RAAs are plan assets. The *Edmonson* court relied on *Mogel* in determining that any funds the insurer had *not* transferred into the plaintiffs' RAAs were plan assets. The *Edmonson* court also cited *In re Luna*, 406 F. 3d 1192 (10th Cir. 2005), which held that a plan "holds a future interest in the collection of the contractually-owed contributions" in assessing whether benefits in RAAs might constitute plan assets. 777 F. Supp. 2d at 891 (citing *In re Luna*, 406 F.3d at 1199.) *In re Luna* is fundamentally distinguishable, however, because it involved contributions owed by an employer to a plan, not payments due directly to beneficiaries.

[2] The fiduciary definition dealing with plan administration does not refer to "plan assets." 29 U.S.C. § 1002(21)(A)(iii) ("a person is a fiduciary with respect to a plan to the extent he has any discretionary authority or discretionary responsibility in the administration of the plan").

F.3d at 27. The Court believes that, if the First Circuit were required to address the issue squarely, it would not hold that the funds backing the RAAs in this case are plan assets. Accordingly, the Court finds that the Plaintiffs have not stated a claim for breach of fiduciary duties under 406(b), which requires self-dealing in plan assets.

### b. *Plan Administration*

*Mogel* made clear that "once an insured's death occurs," the concern was with the "insurance company's duties with respect to the payment that is now due the beneficiary." *Mogel*, 547 F.3d at 27. "[T]he disposition to the beneficiaries of the benefits due under the plan falls comfortably within the definition of fiduciary duties with respect to plan administration." *Id.*

Unum asks us to distinguish M*ogel* because the plaintiffs in *Mogel* had policies that called for payment to the beneficiaries by a lump sum payment. Unum argues that these policies in the instant case require payment by RAAs and that Unum discharged its duties by providing RAAs. Unum cites *Faber,* which held that that once an insurance company "creates and credits a beneficiary's [RAA] and provides a checkbook, the beneficiary 'has effectively received a distribution of all the benefits that the Plan promised' and 'ERISA no longer governs the relationship" between the insurer and the beneficiary. *Faber*, 648 F.3d at 102 (quoting DOL Opinion at p. 11 (Doc. # 26-2)).

The Court disagrees that simply providing RAAs to the Plaintiffs ends the inquiry into satisfaction of Unum's fiduciary duties:

> There is more to plan (or trust) administration than simply complying with the specific duties imposed by the plan documents or statutory regime; it also includes the activities that are "ordinary and natural means" of achieving the "objective" of the plan. Indeed the primary function of the fiduciary duty is to constrain the exercise of discretionary powers which are controlled by no other specific duty imposed by the trust instrument or the legal regime. If the fiduciary duty applied to nothing more than activities already controlled by other specific legal duties, it would serve no purpose.

*Varity Corp. v. Howe*, 516 U.S. 489, 504, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996) (quoting Bogert & Bogert, *Law of Trusts and Trustees* § 551, at 41-52). The Court is obliged to look at whether Unum retained any discretion in its provision of RAAs to the Plaintiffs and, if so, whether it exercised that discretion solely in their interests.

### 3. Breach of the Duty to Administer the Plans Solely in the Interests of the Beneficiaries (29 U.S.C. § 1104(a))

The plans provide that payment will be by RAAs, which are defined as interest-bearing accounts established through an intermediary bank in the name of the beneficiary. When Unum chose to award itself the business of administering the Plaintiffs' RAAs and chose to retain the assets backing these accounts, Unum was exercising its discretionary authority and responsibility in the administration of the Peabody and St. Joseph's Plans.

In doing so, Unum chose to maximize its own profits by setting the RAAs' interest rate just high enough to forestall mass withdrawal of the funds backing these accounts. The Court is unaware of whether there are banks or other institutions which would have bid on Unum's book of RAA business, offering no-fee demand accounts on better terms than those offered by Unum. What is clear, however, is that Unum managed the RAAs to optimize its own earnings and not to

optimize the beneficiaries' earnings. Unum is not required to place its pool of funds with a third party. However, Unum-the-fiduciary is under an obligation to look at Unum-the-RAA-service-provider with a critical eye. If Unum wished to retain the RAA business for itself, as a fiduciary it was under an obligation to offer terms comparable to the best terms available on the market. Unum's own research revealed that the 1% rate it provided was low compared to its competitors, which offered an average rate of about 2%, with some as high as 4%. Although further factual development would be required to determine the reasonableness of the interest rate at any particularly point in time, this evidence of competitors' rates suggests that Unum was acting in its own self-interest, not solely in the interest of the beneficiaries, in setting the interest rate. Accordingly, Unum has breached its fiduciary duty to the Plaintiffs under ERISA Section 404(a), and the Plaintiffs are entitled to partial summary judgment as to liability on this claim.

The Court wishes to emphasize that the RAA method of payment itself is not necessarily inconsistent with ERISA. The Court agrees with the DOL that *Mogel* does not imply any general restrictions on the method of payment chosen by plan settlors. *See* DOL Opinion at p. 13 (Doc. #26-2) ("*Mogel* does not stand for the broader proposition that the insurance company can never 'retain' plan assets and use them for its own benefit, regardless of whether the plan specifically provided for a lump sum case distribution or simply for the creation of a [RAA].") The plan settlor generally has wide discretion to design an employee welfare benefit plan, *see Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444, 119 S. Ct. 74, 142 L. Ed. 2d 881

(1999), and the Plaintiffs have not pointed to any prohibition under ERISA against paying guaranteed-benefit claims through the establishment of RAAs. Indeed, RAAs are in some ways superior to lump sum payments in that they provide flexibility and at least some interest for people who are without a bank or who need time to consider their investment options. It is inconsistent with ERISA's goals to prohibit this type of arrangement.

Unum's difficulty in this case was not in using RAAs as a method of payment, but rather in offering insurance policies that left discretion to Unum to determine the interest rates and other features accruing to these accounts. If Unum had set forth the pertinent features of the proposed RAAs in the plan itself,[3] it could have removed discretion from the administration of these plans. Setting forth the features of the RAAs in the plan also provides plan settlors with information that they can compare with other policies and aids settlors in making informed decisions regarding their group-life policy purchases.

### 4. Unum's Affirmative Defenses: Consent and Ratification

Unum argues that the Plaintiffs are not entitled to summary judgment on liability because the parties dispute the extent to which the Plaintiffs knew that Unum was retaining and investing their funds. Unum appears to argue that so long

---

[3] Unum asserted at oral argument that no insurer would commit to fixing an interest rate on future RAAs at the time policies are purchased, and that such a requirement would spell the end of RAAs as a method of payment for all ERISA-governed life-insurance policies. Unum acknowledged, however, that it is possible to set interest rates in advance that are tied to an index rate. There are surely other creative ways to define the features of these proposed RAAs so as to remove discretion from their creation at the time the benefits vest but that allows an avenue toward profit (and therefore an incentive to offer RAAs) for the insurance companies. The Court acknowledges that setting forth these features in advance may lower the profitability of RAAs for insurance companies by removing some flexibility and creating pressure to compete with other insurance companies in the rates and other terms offered up front. This, however, does not appear to be a bad outcome for the market.

as beneficiaries allowed their funds to remain in the RAAs, knowing that Unum was retaining and investing the funds backing those accounts, they consented or ratified any breach of fiduciary duty that Unum committed.

Maine's Trust Code 18-B M.R.S.A. § 1009, cited by Unum in support of this assertion, does not equate mere knowledge of a trustee's actions with consent or ratification of a breach of the trustee's fiduciary duties. In fact, the Uniform Comment to this section states, "[a] consent, release, or affirmance under this section may occur either before or after the approved conduct. This section requires an affirmative act by the beneficiary. A failure to object is not sufficient...." 18-B M.R.S.A. § 1009, Uniform Comment. Unum has presented no evidence that the Plaintiffs undertook any affirmative act indicating consent to its conduct.

Moreover, the Comment states that, "[t]o constitute a valid consent, the beneficiary must know of the beneficiary's rights and of the material facts relating to the breach." *Id.* Unum does not contend that it informed the Plaintiffs that it:

- retained the funds backing the RAAs for the purpose of generating investment income from those funds;
- set interest rates on the RAAs at the lowest rate that would maximize retention of those funds in the RAAs;
- had a fiduciary obligation to set interest rates on these accounts solely in the Plaintiffs' interest; or
- asked the Plaintiffs to consent to its self-interested interest-rate setting on these accounts.

For these reasons, Unum has failed to generate any material issues of fact with regard to consent or ratification by the Plaintiffs.

### 5. The Availability of the Relief Sought By the Plaintiffs

The Plaintiffs bring their ERISA claims under 29 U.S.C. § 1132(a)(3), which states in pertinent part that a claim may be brought:

> by a . . . beneficiary . . . (A) to enjoin any act or practice which violates any provision of this subchapter [regarding protection of employee benefit rights] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

Unum contends that the relief that Plaintiffs seek amounts to a money judgment against Unum. It asserts that this is not equitable relief and therefore cannot be obtained by the Plaintiffs. The Plaintiffs style the relief they seek as a declaration that Unum was unjustly enriched by the "profits" it obtained from its investment of the funds backing their RAAs. They further seek to impose a constructive trust upon Unum's funds to the extent of these profits and to disgorge the funds held in the constructive trust.

The fact that the Plaintiffs may obtain monetary relief out of this litigation does not mean that their claims against Unum are not equitable. The Supreme Court recently considered the scope of relief available under Section 1132(a)(3), and concluded that monetary relief is available. *Cigna Corp. v. Amara*, 131 S. Ct. 1866, 1880, 179 L. Ed. 2d 843 (2011) ("Equity courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment."). *See also Edmondson*, 777 F. Supp. 2d at 891-92 (finding that plaintiffs' request for disgorgement of insurer's

investment profits on the funds backing their RAAs was appropriate under 29 U.S.C. § 1132(a)(3))).

It also appears under general trust principles that the remedies of a beneficiary against a trustee are almost exclusively equitable. *See Restatement (Second) of Trusts* (1959) §§ 197 and 198 ("the remedies of the beneficiary against the trustee are exclusively equitable"… except for cases in which the trustee is under an obligation to immediately and unconditionally transfer money or chattel to the beneficiary); *cf. Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210, 122 S. Ct. 708, 151 L. Ed. 2d 635 (2002) (making distinctions between the equitable versus legal nature of restitution where the defendant was not a fiduciary but a beneficiary, and the claim was "for a contractual obligation to pay money-relief that was not typically available in equity.") Accordingly, the Plaintiffs' claims do not appear to be barred by unavailability of the relief they seek.

However, this does not mean that the Plaintiffs are entitled to disgorgement of Unum's entire investment spread. Unum breached its fiduciary duties by awarding the RAA business to itself without offering the best overall RAAs to the Plaintiffs. No vendor would service interest-bearing demand accounts without either charging fees or obtaining an appreciable volume of assets from which to make an investment spread. Unum has "profited" from the Plaintiffs to the extent it used its proprietary position to retain these accounts on terms less favorable than other vendors might have offered for the same book of business.

## B.    Breach of Contract and Violation of 24-A M.R.S.A. § 2436

Under their breach of contract and statutory late payment claims, the Plaintiffs assert that, by setting up RAAs instead of issuing checks, Unum failed to make the complete, timely payment that was due to them under their contracts. The Court disagrees.

The plain language of these GISBs makes it clear to an ordinary person in the Plaintiffs' shoes that payment will be made upon approval of their claims by means of setting up an RAA.[4] An ordinary person receiving the blank drafts, account statement and Welcome Kit issued by Unum would understand that she could obtain the entire amount of her benefit by writing out a draft to herself and depositing the draft into her personal account. An ordinary person in the Plaintiffs' shoes would not be confused about Unum's use of the term "payment" as referring to this uncomplicated procedure.

The Plaintiffs' statutory claim under Maine's late payment statute, 24-A M.R.S.A. § 2436, is contingent upon Unum's failure to timely make payment according to the terms of its contracts. This statute states in pertinent part:

---

[4] Maine law governs the Peabody and St. Joseph's Policies. Under ordinary rules of insurance contract interpretation in Maine, ambiguities are strictly construed against the insurer and in favor of the "coverage" sought by the insureds. *See e.g. Hughes v. Bos. Mut. Life Ins. Co.*, 26 F.3d 264, 268 (1st Cir. 1994); *Foremost Ins. Co. v. Levesque*, 2005 ME 34, ¶ 7, 868 A.2d 244, 246. Under Maine law, language in an insurance contract is ambiguous if it "is reasonably susceptible of different interpretations." *Peerless Ins. Co. v. Brennon*, 564 A.2d 383, 384 (Me. 1989). In addition, a policy of insurance is ambiguous if an ordinary person standing in the insured's shoes would not understand that the policy did not cover claims such as those brought. *Id.*

Unum claims that it is entitled to deferential review of its contract terms because it has provided itself with discretionary authority to interpret the terms and provisions of its summaries of benefits. *See Maher v. Mass. Gen. Hosp. Long Term Disability Plan*, 2011 WL 6061347 at *2 (1st Cir., Dec. 7, 2011). The Court need not determine whether this standard of review is applicable because even applying non-deferential rules of interpretation the plan is unambiguous.

> A claim for payment of benefits under a policy or certificate of insurance delivered or issued for delivery in this State is payable within 30 days after proof of loss is received by the insurer and ascertainment of the loss is made either by written agreement between the insurer and the insured or beneficiary or by filing with the insured or beneficiary an award by arbitrators as provided for in the policy…. A claim that is neither disputed nor paid within 30 days is overdue.

24-A M.R.S.A. § 2436(1).

The Court agrees with Unum that *Dodge v. United Servs. Auto. Ass'n*, 417 A.2d 969 (Me. 1980) provides whatever guidance is needed on the question of whether Unum's presentation of blank drafts, statements, and explanatory Welcome Kits to the Plaintiffs satisfies this statute's requirement of payment within 30 days. *Id.* at 973 ("Section 2436 neither purports to prescribe nor to prohibit any particular method of payment; it merely sets forth the applicable time limits beyond which payments shall be considered overdue."). As Unum points out, if it had presented checks to the Plaintiffs, they would have still had to deposit these checks to their accounts. It is by no means a violation of the late payment statute when an insurer presents a check to an insured which the insured thereafter fails to deposit. By providing blank drafts, account balances, and a plain-language explanation of the RAAs to the Plaintiffs, Unum provided the Plaintiffs with unconditional access to their benefits, the same — considering the purpose of the Late Payment Statute — as if it had issued a check. Accordingly, Unum is entitled to summary judgment on the Plaintiffs' claims for breach of contract and under 24-A M.R.S.A. § 2436.

### C.     Class Certification

The Plaintiffs seek to certify two classes as follows:

The "**ERISA Class**" [for] all persons who satisfy each of the following criteria:

a. At any time after October 28, 2004 (the date six years immediately preceding the filing of the complaint) and continuing to the present;

b. They were beneficiaries under ERISA-governed employee welfare benefit plans that were insured by UNUM under insurance contracts that contain the following settlement language:

  (i)     "If you or your dependent's life claim is at least $10,000, Unum will make available to the beneficiary a retained asset account (the Unum Security Account). RETAINED ASSET ACCOUNT is an interest bearing account established at an intermediary bank in the name of your beneficiary, as owner. Payment for the life claim may be accessed by writing a draft in a single sum or drafts in smaller sums. The funds for the draft or drafts are fully guaranteed by Unum;" or

  (ii)    any other substantially similar operative settlement language providing for the settlement of death benefit claims via a Retained Asset Account; and

c. Under which UNUM retained any part of their death benefits using Retained Asset Accounts ("RAA"), irrespective of the nomenclature used to refer to such account including, but not limited to, "Money Market Account," "Retained Asset Account," "UNUM Retained Asset Account" and/or "UNUM Security Account."

And:

The "**Maine PMI Subclass**" or "Subclass" [for] all members of the ERISA Class who satisfy each of the following criteria:

a. They were beneficiaries of ERISA-governed employee welfare benefit plans issued by UNUM wherein the "Governing Jurisdiction" is Maine; and

b. Under which UNUM did not pay post-mortem interest at the rate of 1.5% per month (18% per annum) on funds retained by UNUM for more than 30 days after ascertainment of loss.

Plaintiffs' Motion to Certify Class and Subclass at p. 1 (Doc. # 29).

The Court denies the Plaintiffs' motion for certification of the Maine PMI Subclass because it has granted summary judgment to Unum on the claims supporting this proposed class. The inquiry that follows concerns only certification of the general ERISA class.

Under Fed. R. Civ. P. 23, the Court engages in both a general and a specific set of inquiries relating to class certification. The general prerequisites for class certification are contained under Rule 23(a) as follows:

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members in impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23. The Court must then review the additional requirements contained under Rule 23(b) to determine if the plaintiffs fit within any of the particular types of classes articulated therein.

The Plaintiffs contend that the ERISA class meets the requirements of 23(b)(1) and 23(b)(3). These state respectively:

A class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual class members would create a risk of:
> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

> \* \* \*

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Unum proceeds from the premise that this case is about "delayed payment" of funds due to the Plaintiffs and argues that each beneficiary's knowledge and motivation in choosing to leave their funds in RAAs is central to a determination of liability. Unum asserts that the unique knowledge and motivation of each Plaintiff precludes a finding of commonality, typicality, or adequacy of representation under Rule 23(b)(1), as well as a finding of predominance and superiority under Rule23(b)(3). Unum refers particularly to the fact that in February of 2009, it began sending out letters that were explicit about the fact that Unum would retain and invest the funds backing the RAAs.

Unum's argument is based on a view of the issues not adopted by the Court. As discussed in the summary judgment portion of this Order, Unum's breach of fiduciary duty arose out of its discretionary choices to retain the assets behind the RAAs in its own general account and to set the features for these RAAs, including the applicable interest rates, in its own interest rather than solely in the interest of the beneficiaries.

These choices affected all of the beneficiaries in a similar manner—*i.e.* in the loss of additional interest to their accounts for the period of time in which they left their funds in the RAAs. The Plaintiffs' individual damages will be different depending upon when their benefits vested and how long they kept their money in the RAAs. However, the Plaintiffs' varying motivations for leaving money in these accounts are not relevant to Unum's liability or to the calculation of damages.

Unum also claims that the proposed class is divided by ERISA's three-year statute of limitations on claims for breach of fiduciary duty in which the plaintiff had actual knowledge of the breach or violation. *See* 29 U.S.C. § 1113.[5] Actual knowledge requires that a plaintiff know "the essential facts of the transaction or conduct constituting the violation." *Otte v. Life Ins. Co. of North America*, 275 F.R.D. 50, 56 (D. Mass. 2011) (quoting *Edes v. Verizon Commc'n, Inc.*, 417 F.3d 133,

---

[5]     This section states:
No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part . . . after the earlier of—
(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation; except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

142 (1st Cir. 2005)). In this case, unlike in *Otte*, Unum did not provide disclosure sufficient to illuminate its practices prior to February of 2009. Prior to February of 2009, Unum sent "Welcome Letters" to the Plaintiffs which stated that the Plaintiffs' money "has been deposited in a security account, which is a money market account set up in your name." While the Security Account Terms and Conditions included with the Welcome Letter stated "The UnumProvident Security Account is not insured by the FDIC," this notice was contained in very small type at the end of the terms and conditions. Even if some Plaintiffs read this inconspicuous notice, it is not clear how many would have understood that Unum was retaining and investing the funds behind these accounts.

The Plaintiffs filed their complaint on October 29, 2010, well within the three-year statute of limitations for those who received letters from Unum after it began making more complete disclosures in February of 2009. Thus, there appears to be no cause at this time to consider whether to certify a separate subclass consisting of those whose claims arose prior to October 29, 2007. If discovery discloses that, in spite of the inadequacy of the pre-February-2009 communications, some class members nevertheless understood that Unum was retaining and investing the assets behind their RAAs, the parties can request certification at that time of a sub-class to represent the specific interests of this group, including any defense against Unum's statute-of-limitations defense.

Unum also claims that some of the Plaintiffs may have either consented to or ratified Unum's actions in this case, a defense that requires individualized

determinations that break up the commonality of the issues among the Plaintiffs and prohibit a finding of predominance. The Court found in its order on summary judgment that Unum has created no material issues of fact with regard to this defense. This determination was based on the facts relating to the named Plaintiffs. If discovery reveals that certain individuals within the class may have taken affirmative action constituting informed consent, the Court will entertain a request to certify a subclass in this regard. *See Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003) (if "evidence later shows that an affirmative defense is likely to bar claims against at least some class members, then a court has available adequate procedural mechanisms" to address such contingencies, including exclusion of these members from the class or the creation of a subclass).

Unum also argues that certification under Rule 23(b)(1) is inappropriate. While the Court agrees,[6] the Plaintiffs have demonstrated that certification under

---

[6] The Plaintiffs have requested, *inter alia*, "[t]hat the Court declare that Unum has violated ERISA and that Unum has been unjustly enriched as a result of its violations of ERISA" and "[t]hat the Court issue appropriate injunctive relief enjoining Unum's violations of ERISA and Maine law," First Amended Complaint, ¶ 74 (Doc. # 19). The Plaintiffs, citing a 2001 case from the Eastern District of Pennsylvania, assert that certification under Rule 23(b)(1)(A) is appropriate where plaintiffs seek broad declaratory and injunctive relief related to the defendant's conduct, because "conflicting declaratory and injunctive relief could make compliance impossible for defendants." *Thomas v. SmithKline Beecham Corp.*, 201 F.R.D. 386, 397 (E.D. Pa. 2001). While this is a sensible interpretation of Rule 23(b)(1)(A)'s aim, the Plaintiffs' claims for declaratory and injunctive relief are unnecessary and may even be untenable. With regard to the Plaintiffs' claims for declaratory relief, a "declaration" of the Plaintiffs' rights under 28 U.S.C. §§ 2201-2202 would not settle the controversy between the parties because Unum has already breached its fiduciary duties and some form of surcharge or disgorgement is the only adequate remedy. *See* Fed. R. Civ. P. 57 commentary on the 1937 adoption ("When declaratory relief will not be effective in settling the controversy, the court may decline to grant it.")

With respect to the request for injunctive relief, the named Plaintiffs have already withdrawn their funds from Unum's RAA's and they have no further relationship with Unum. There is thus no ongoing violation with respect to these Plaintiffs which would provide a basis for injunctive relief. While there are class members who may still have funds with Unum, the Plaintiffs have not brought forward any particular facts related to their circumstances, nor have they articulated what, if any sort of injunction they think would be necessary in the wake of a finding by

Rule 23(b)(3) is appropriate, and the Court grants certification under this provision. The Court acknowledges Unum's admonition that a rigorous analysis of the class certification requirements is in order, *see Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), but notes that the work required in this regard has been accomplished by the Court's order on summary judgment.

In reviewing the summary judgment record and the arguments presented thereon by the parties, it is apparent that questions of law and fact common to class members predominate over any questions affecting individuals. Likewise, the class members' claims appear to be individually quite small,[7] making their interests in individually controlling this litigation quite limited. The class action format should provide an efficient and fair method of combining and adjudicating these claims.

## VI.    INTERLOCUTORY APPEAL

The Court is of the opinion that, although this order is not otherwise appealable at this time, it involves controlling questions of law as to which there is substantial ground for difference of opinion, including the Court's determinations

---

the Court that Unum has breached its fiduciary duty to set interest rates solely in the interest of the Plaintiffs. Thus, because the Plaintiffs have not demonstrated that broad declaratory and injunctive relief are likely to result in this case, the Plaintiffs have not identified a basis on which to grant certification under Rule 23(b)(1)(A).

Certification is appropriate under Rule 23(b)(1)(B) in situations where the plaintiffs seek recovery to a plan of illegal profits from an ERISA fiduciary under 29 U.S.C. § 1132(a)(2). Unum points out that this is appropriate only because, once a fiduciary has been ordered to restore to the plan its improperly made profits, the claims of all other beneficiaries of the plan would, as a practical matter, be resolved. Unum's Response to Plaintiffs' Motion to Certify Class at p. 19 (Doc. # 49.) The Court agrees that, since the Plaintiffs do not seek to restore funds to a common plan but instead seek individual recoveries, the justification for Rule 23(b)(1)(B) certification disappears.

[7] For example, Mr. Mowery obtained $23.64 in accrued interest on his $62,300 in benefits. If the applicable rate for the period in which benefits remained in Mr. Mowery's account should have been 3% instead of the 1% he was given, his claim in this case would amount to $47.28. The rate of interest chosen for this example is for illustrative purposes only, and is in no way meant to suggest what the appropriate rate of interest should have been.

that the funds backing the RAAs are not plan assets and its determination that Unum breached its fiduciary duties to the Plaintiffs by failing to solely consider their interests when investing the funds behind the RAAs for its own benefit. The Court finds that pursuant to 28 U.S.C. § 1292, an immediate appeal from this order may materially advance the ultimate termination of the litigation, especially in light of the fact that similar issues are or may be addressed by the First Circuit in the appeal of *Otte v. Life Ins. Co. of N.A.*, 275 F.R.D. 50 (D. Mass. 2011).

## VII.  CONCLUSION

The Plaintiffs have failed to demonstrate that Unum committed any breach of contract or that it is liable to the Plaintiffs under Maine's late payment statute, 24-A M.R.S.A. § 2436, and summary judgment is entered in favor of Unum on these counts of the Plaintiffs' First Amended Complaint. The Plaintiffs are, however, entitled to partial summary judgment on Unum's liability for breach of its fiduciary duty imposed under ERISA Section 404(a) in regard to its administration of the relevant plans. Unum is not liable, however, for self-dealing in plan assets under ERISA Section 406(b) because the funds retained by Unum were not plan assets. Accordingly, the Plaintiffs' motion for partial summary judgment is GRANTED IN PART and DENIED IN PART and Unum's motion for summary judgment is GRANTED IN PART and DENIED IN PART. The Plaintiffs' request for class certification is GRANTED under Fed. R. Civ. P. 23(b)(3).

## VIII.   SEALING OF THIS DECISION

The Court DIRECTS the Clerk of the Court to seal this opinion when docketed. The parties shall notify the Court by noon on Tuesday, February 7, 2012, with due regard to the public's interest in access to court proceedings, whether this opinion contains any confidential information that should remain sealed and, if so, indicate explicitly what language is proposed to be redacted, and why.  If the Court does not hear from the parties by noon on Tuesday, February 7, 2012, this opinion will be unsealed.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 3rd day of February, 2012.