## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| DENISE MERRIMON and | ) | |
| BOBBY S. MOWERY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil No. 2:10-cv-00447-NT |
| | ) | |
| UNUM LIFE INSURANCE | ) | |
| COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND OPINION

### I.   PROCEDURAL BACKGROUND

This class-action lawsuit concerns the crediting of interest rates on certain retained asset accounts (RAAs) arising out of group life insurance policies that were issued by Defendant Unum Life Insurance Company of America (Unum) and governed by the Employee Retirement Income Security Act of 1974 (ERISA).

On February 3, 2012, the Court certified the class and granted partial summary judgment to the Plaintiffs on the question of Unum's breach of fiduciary duty. *Merrimon v. Unum Life Ins. Co. of Am.*, 845 F. Supp. 2d 201 (D. Me. 2012). The undisputed facts established that, pursuant to the terms of Unum's group life policies, Unum retained discretion to determine the interest rate credited to the Plaintiffs' RAAs and to change the credited interest rate at any time. The Court held that under ERISA § 404(a), 29 U.S.C. § 1104(a) (2012), Unum was engaging in plan administration when it set interest rates on its RAAs, and that therefore ERISA imposed a statutory fiduciary duty on Unum to act solely in the interest of

the beneficiaries. The Court also held that the undisputed material facts established that Unum breached this fiduciary duty. Left unresolved was the question of what, if any, damages the Plaintiffs sustained as a result of this breach.

From June 24, 2013 through June 27, 2013, the Court held a bench trial on the issue of damages. Set forth below are the Court's findings of fact and conclusions of law.

## II.   FINDINGS OF FACT

### A.   Background

Unum is a subsidiary of Unum Group, a publicly traded company with about $40 billion in total assets. Def.'s Exh. 65 at 12. In addition to Unum, Unum Group's subsidiaries include Unum Limited, Provident Investment Management Company (PIMCO),[1] Provident Life and Accident Insurance Company, the Paul Revere Life Insurance Company, and Colonial Life & Accident Insurance Company. *Id.* Unum sells life, disability, and long-term care insurance products, often to employers as parts of benefits packages that employers provide to their employees. Tr. 1 at 157; Def.'s Exh. 65 at 12−13.

Unum, along with other insurance companies, began using RAAs in the 1980s as an alternative to sending checks to beneficiaries when lump sum insurance payments are due. RAAs are frequently used in connection with the payment of term life insurance, though they may be set up following approval of claims under other types of insurance as well. The RAAs at issue in this case are

---

[1]   PIMCO – Unum Group's investment subsidiary – manages the assets of Unum. Tr. 4 at 789; Def.'s Exh. 65 at 54.

governed by ERISA because they stem from group life insurance policies purchased by employers as part of benefits packages offered to their employees.

The class that was certified by the Court includes anyone who, after October 28, 2004, was a beneficiary under an ERISA-governed "CXC" group life policy issued by Unum under which an RAA was set up. The policies at issue in this case allow claims of $10,000 or more to be paid through the establishment of RAAs: "If you or your dependent's life claim is at least $10,000, Unum will make available to the beneficiary a **retained asset account** (the Unum Security Account). . . . Also, you or your beneficiary may request the life claim to be paid according to one of Unum's other settlement options." Revised Joint Stipulations of Fact (RJSF) ¶ 4 (ECF No. 132). CXC policies define an RAA as "an interest-bearing account established through an intermediary bank in the name of you or your beneficiary as owner." RJSF ¶5. CXC policies do not define the applicable interest rate or any method for calculating the interest rate. RJSF ¶ 6.

## B.   Features of Unum's RAAs

Following the death of a covered employee, the employer who holds the group life policy submits a claim to Unum that includes information on the beneficiary. Trial Transcript, June 24, 2013 (Tr. 1), pgs. 173–74 and 177 (ECF No. 146). Upon approval of the claim, Unum sets up an RAA with a third-party RAA administrator that establishes an account through an intermediary bank in the name of the beneficiary. *Id.* at 174–75. No money is transferred into the account, but UNUM sends the beneficiary a book of drafts that may be used to obtain the proceeds of the

policy. *Id.* at 110–11 and 154. When the beneficiary presents a draft for payment, the intermediary bank presents the draft to Unum, and Unum then transfers funds sufficient to cover the draft from its own account to the bank. Court Exh. 2 at 34–36 (Dep. of Linda Bessman).

The RAA is a liquid account. Tr. 1 at 83; Trial Transcript, June 25, 2013 (Tr. 2), pg. 346 (ECF No. 147). The beneficiary may write drafts for payment at any time, and payment is made within the same timeframe as payment on an ordinary personal check. Tr. 2 at 346; Court Exh. 2 at 31–36. RAA drafts may only be written for amounts of $250.00 or greater, RJSF 9, and account holders are not permitted to add any money to their RAA. Unum reserves the right to change the applicable interest rate on RAAs, and it credits interest to each RAA on a monthly basis. Tr. 1 at 113–14; Trial Transcript, June 27, 2013 (Tr. 4), pg. 738 (ECF No. 149). RAA statements are also sent out once a month. Tr. 1 at 113–14. There are no fees for maintaining the RAA or for writing checks on the RAA. Tr. 1 at 93.

Unum is obligated to pay the principal and interest credited to its RAAs. Unum also asserts that its RAAs are guaranteed by its parent company, Unum Group. In support of this, Unum put into evidence a draft form letter to beneficiaries dated April 5, 2011, which stated that its RAAs are "fully guaranteed by Unum Group." Def.'s Exh. 4. But this letter was dated toward the end of the class period, and Unum was unable to establish when, if ever, it became part of the literature sent to the Plaintiff class. *See* Tr. 1 at 201 and 206. This draft letter also competes with different disclosures received by members of the Plaintiff class,

4

which stated: "The UnumProvident Security Account is not insured by the FDIC. Principal and interest earned under the UnumProvident Security Account are fully guaranteed by the underwriting subsidiaries of UnumProvident Corporation." Def.'s Exh. 37, bates stamp UNUM00006759.[2] The Court cannot find that Unum Group guaranteed Unum's RAAs based on this evidence.

## C.   Unum's Investments and Risks

Unum invests the premiums it receives from its insurance products, and it pays its insuring obligations out of a combination of maturing investments and incoming premiums. *See* Def.'s Exh. 65 at 13−18; RJSF ¶ 32. At the end of 2004, Unum's portfolio contained assets valued at $1.2607 billion, which were largely invested in a combination of instruments that provided a fixed return on capital. Pls.' Exh. 27. One of Unum's investment goals was to match the assets in Unum's portfolio with its insuring obligations so that Unum's liquid assets would be sufficient to pay Unum's obligations as they arose, a practice referred to as "duration matching." Def.'s Exh. 65 at 24−25. Actuaries were used to make predictions concerning the number of claims to be expected under Unum's policies, and PIMCO's investment professionals were used to balance the risks and returns in Unum's portfolio, given the projected size of Unum's obligations. *See id.*

Unum's portfolio was invested overwhelmingly in fixed-rate debt instruments, and Unum generally did not invest in stocks or other equity

---

[2]      This document, termed "UnumProvident Security Account Terms and Conditions" was captioned "date unknown" on the Revised Joint Exhibit List (ECF No. 144). At summary judgment, Unum filed the same papers (ECF No. 35), claiming that these terms and conditions were an "exemplar" of those sent to beneficiaries. Decl. of Marlene Ingraham ¶ 5 (ECF No. 32).

instruments, where the potential return on investment was unlimited but also unpredictable and thus not a good match for Unum's liabilities. Def.'s Exh. 65 at 14, 18-20, and 24-28. Unum was able throughout the class period to achieve a predictable return on investment that was well-matched to its liabilities. Pls.' Exh. 27; Tr. 2 at 379; Tr. 4 at 737−38.

Unum's investment strategy exposed it to three types of risk — interest-rate risk,[3] default risk,[4] and liquidity risk. Def.'s Exh. 65 at 18−19. Liquidity risk, which was the most pertinent in this case, was the risk that Unum would not have sufficient cash on hand to cover its current liabilities and would be forced either to sell unmatured investments at a loss or to apply for a loan. Def.'s Exh. 65 at 20, 35−38. Unum managed this risk by keeping some cash on hand, and also by laddering[5] its investments. Def.'s Exh. 65 at 29−31, 37−38. Ideally, Unum's incoming premiums and ongoing returns in maturing investments would cover liabilities as they came due, so that no assets would have to be sold prior to maturity. *See id.* Robert Hensley, PIMCO's vice president of asset liability management and investment strategies, testified that during his tenure, Unum

---

[3]    Unum's fixed-rate instruments would lose market value as market interest rates rose and made its fixed rates comparatively less attractive. *See* Def.'s Exh. 65 at 29, 31. The longer the duration of Unum's fixed-rate investments, the greater the interest-rate risk those investments held. *See id.* Because Unum's products—term-life and disability-insurance products—promised fixed lump sum payments that would remain the same regardless of market interest rates, Unum was largely insulated from interest-rate risk. *See* Def.'s Exh. 65 at 24. So long as Unum's assets matched its liabilities, fluctuations in market interest rates were not a primary source of concern.

[4]    Default risk was the risk that the entities to which Unum loaned money would not pay back their loans. Def.'s Exh. 65 at 18. Government bonds carried virtually no default risk, but high-yield corporate bonds carried comparatively high default risk. *See* Def.'s Exh. 64, slide 001A. During the course of the class period, as government bond rates declined, Unum took on more high yield corporate bonds which nearly tripled its default rate between 2008 and 2012. *See*, Pls.' Exh. 27.

[5]    Laddering refers to the continuous purchase of fixed-duration instruments so that, over time, the instruments continually mature and create a stream of income. Tr. 3 at 690.

never had a shortfall. Def.'s Exh. 65 at 49. If there had been a shortfall, Hensley stated that Unum would first look to sell investments in its own portfolio, and after that might apply for a loan from Unum Group or third-party sources. Def.'s Exh. 65 at 35–38. Throughout the class period, Unum at all times met its obligations, and Unum's claims-paying ability and overall financial picture were strong.[6]

Unum's conservative investment objectives created a portfolio that was an excellent fit for weathering the financial crisis that hit the nation in 2008. Unum's net annual effective portfolio yields, including default losses, were a very stable 6.87% in 2004, 6.93% in 2005, 6.89% in 2006, 6.84% in 2007, 6.77% in 2008, 6.76% in 2009, 6.74% in 2010, 6.53% in 2011, and 6.37%[7] in the first half of 2012. Pls.' Exh. 75, Slide 2.  At least up to the point of a total company failure,[8] it was Unum and not the Plaintiffs that bore the risk of its investments.

### D. Unum's Investment of Funds Backing RAAs and the Benefit of RAAs to Unum

Throughout the class period, roughly one third to almost one half of Unum's portfolio consisted of retained assets, i.e. approved claims that had not yet been drafted out of RAAs by beneficiaries.[9]  Robert Hensley testified that Unum's

---

[6]    Between 2004 and 2012, Unum's claims-paying ability was rated by A.M. Best as either A- or A, which is an excellent, though not superior, rating (superior ratings include A+ and A++). Pls.' Exh. 79; Joint Exh. 11.

[7]    This number represents the percentage yield on an annual basis reporting for the first six months—*i.e.*, the portfolio would have yielded 3.19% for the first half of the year.

[8]    Under the federal Bankruptcy Code, 11 U.S.C. § 109(b), insurance companies cannot enter bankruptcy. Instead, insurance companies are monitored by the states in which they do business, and, if an insurer becomes insolvent, in may be taken over by the state in a receivership. *See, e.g.,* Maine's Insurance Rehabilitation and Liquidation Law, 24-A M.R.S.A. §§ 4351–4386.

[9]    In 2004, this was $524.9 million out of $1.2607 billion, or 42%; in 2005, $494.5 million out of $1.093 billion (45%); in 2006, $429.2 million out of $988.3 million (43%); in 2007, $374.3 million out of $961.1 million (39%); in 2008, $356.1 million out of $984.3 million (36%); in 2009, $370.4 million out of $999 million (37%); in 2010, $426.6 million out of $1.062 billion (40%); in 2011, $440.4 million

obligations on its RAAs are "overnight" liabilities, meaning that RAA-holders may demand the entire amount due in their RAAs at any time, and such demands are payable overnight. Def.'s Exh. 65 at 27, 32, 47. Because RAAs are overnight liabilities, Hensley asserted, PIMCO did not perform duration-matching of its invested assets with RAA liabilities. *Id.* at 27.

The implication of Hensley's testimony is that Unum could not invest the funds backing its RAAs in any sort of long-term investments because it could be required to pay all of these obligations at any time. But that is not reflected in the way Unum handled the funds backing the RAAs. Tr. 2 at 314−315. In 2005, the funds obligated to RAAs accounted for 45% of Unum's investment portfolio, yet only 18.3% of its portfolio consisted of liquid assets.[10] Unum kept close tabs on the behavior of its RAA account-holders, obtaining regular reports from its third-party RAA administrator regarding percentages of withdrawals from RAAs as these accounts aged. Tr. 1 at 117, 193, 204; Pls.' Exhs. 40−45. To be sure, it was *possible* that all RAA-account holders could, in one moment, demand payment of all of the RAA obligations held by Unum in a run-on-the-bank scenario, but that cannot be what Unum expected. *See* Tr. 2 at 314−15.

---

out of $1.131 billion (39%); and in 2012, $444.4 million out of $1.2 billion (37%). *See* Joint Exh. 7; Pls.' Exh. 27 and Def.'s Exh. 65 at 66−67.

[10]     *See* Pls. Exh. 27 and n. 11, *infra see also* March 21, 2006 email, quoted *infra*, in which Unum's employee observed that Unum had "about $200 million of liquid assets" to cover its RAA obligations, which were "over $500 million," i.e., liquid assets sufficient to cover just under 40% of its RAA obligations.

### E.    Unum's Interest-Rate-Setting Procedures and Considerations

Throughout the class period, Unum maintained the same 1% annual rate of interest on its RAAs, credited monthly to the accounts. RJSF ¶ 36. It maintained the ability to change the credited rate at any time, and once approximately every quarter, a committee within Unum would review the rate. Tr. 4 at 738; Tr. 1 at 63. As part of the review, the committee looked at interest rates on interest-bearing checking accounts, money market bank accounts, and six-month certificates of deposit, and it also looked at the interest rates credited to RAAs by other insurance companies. Tr. 1 at 66−67, 125−126; Pls.' Exhs. 3−8. With respect to other RAA interest rates, Unum received data from its third-party RAA administrator, which for much of the class period was the largest administrator of RAAs, with up to 120 clients including Unum. Tr. 1 at 66−68.

During 2005 and 2006 as interest rates rose, Unum's RAA interest-rate committee considered whether it should raise its 1% rate. Pls.' Exhs. 3−8. The committee's discussions centered on the fact that, although Unum's interest rate was among the lowest rates credited by insurance companies on RAAs, it was still above rates set by banks on interest-bearing checking and money-market accounts. Unum had not yet seen heavy enough withdrawals from its RAAs to justify raising its rate. *See id.* One committee member, an actuary at Unum, summarized the committee's considerations in a March 21, 2006 email as follows:

As I mentioned at [sic] staff meeting, I just want to bring you up to date on the operation of the RAA and get your thoughts on our Retained Asset Account crediting strategy.

[The other committee members] and I review the Retained Asset Account crediting rate on a quarterly basis. We compare our crediting rate to that of our competitors, as well as to competing investment vehicles such as money market accounts and interest bearing checking accounts.

Our crediting rate is 1%. Looking at pages 6−7 of the attachment, there are about 100 companies for which the vendor manages a RAA. Comparing competitor crediting rates to our rate:

Minimum = 0.25%
Maximum = 3.94%
Average = 2.12%
Median = 2.15%
Only 4 companies have a rate lower than our 1%.

Our competitors are really not competing for our beneficiary's dollars, because they can't transfer their money to a competitor's RAA. However, a beneficiary can transfer their dollars to competing investment vehicles, which are shown on pages 8−9 of the attachment. We are certainly competitive with the very liquid accounts (which are closest to the characteristics of the RAA) such as money market accounts (0.78%) and interest bearing checking accounts (0.29%), but not that competitive with less liquid accounts such as a 6 month CD (2.91%).

I don't believe there is a marketplace risk due to our crediting rate being lower than our competitor's [sic] rates. I haven't heard of any situation where this has been an issue. The RAA appears to have little, if any, impact on sales.

There is a risk that with such a low crediting rate, we could see heavy withdrawals – but we haven't seen that happen yet. Our persistency in the RAA is comparable with the overall persistency the vendor experiences for all customers combined. We are protected from a large level of withdrawals from the RAA due to about $200 million of liquid assets that can be liquidated without suffering a loss.[11] With over $500

---

[11]    This figure may refer to the combination of cash and floating interest rate (i.e. short-term) securities in Unum's portfolio, along with whatever other short-term or maturing investments were contained in the portfolio. As of December 31, 2005 Unum's portfolio contained $26.5 million in cash,

million in the RAA, the income we get from the interest spread is substantial, and we will continue to manage the RAA to optimize our earnings. At some point, although I don't think we are there yet, we may need to increase the crediting rate in order to keep the dollars here.

We will continue to monitor the experience of the RAA and keep you apprised of the situation.

Pls.' Exh. 6. This email accurately reflects and represents Unum's considerations when setting interest rates on its RAAs.

### F.   A Model for Calculating Damages: Money Market Bank Accounts vs. Money Market Mutual Funds

In a separate order issued today (ECF No. 168) the Court granted Unum's motions to exclude two of three damages models offered by the Plaintiffs' expert Thomas A. McAvity, Jr. The remaining model, Model 3, uses the rates of return on other products comparable to RAAs as a benchmark for RAA interest rates. *See* Tr. 2 at 283–84. The Plaintiffs compared Unum's RAA interest rates to the returns provided on two large, well-known and well-regarded money market mutual funds: Vanguard Prime and Fidelity Cash Reserves. *Id.* at 284, 299–300. Money market mutual funds are made up of highly-rated bonds including government treasury bills. *Id.* at 283. Investors placing their funds in a money market mutual fund earn a minimal return compared to other investments on the expectation that their principal investment will not diminish. These funds are marketed by their managers, including such entities as Vanguard and Fidelity, as extremely safe investments; indeed, the share price of money market mutual funds is typically tied

---

$121 million in floating-rate securities, and Unum's $122.4 million pool of asset-backed securities had an average duration of four months. *See* Pls.' Exh. 27.

to the dollar, such that one share of such a fund is worth $1.00. *See* Tr. 2 at 405−06; Trial Transcript, June 26, 2013 (Tr. 3), pg. 596 (ECF No. 148). Unum's expert Bruce Stangle was able to cite only one instance in which a money market mutual fund "broke the buck"— a phrase that refers to the share price falling below $1.00 with the consequence that the investors lost principal. Tr. 3 at 471−72; *see* Tr. 2 at 405−06. The Plaintiffs' expert, Thomas McAvity, noted that in that one instance, the investors lost only 1% of their principal investment. Tr. 2 at 405−06. Both experts also acknowledged that institutions have supported the value of their money market mutual funds when they were in danger of breaking the buck because of the importance of maintaining the integrity of such funds. Tr. 2 at 405; Tr. 3 at 596. The Plaintiffs presented evidence that Vanguard Prime and Fidelity Cash Reserves provided substantially higher average annual returns than 1% in 2005 (2.97%), 2006 (4.83%), 2007 (5.09%), and 2008 (2.83%). *See* Tr. 2 at 301; Pls.' Exh. 75, slide 6. After 2008, the rates on these funds declined to well below the 1% credited by Unum on its RAAs. Tr. 3 at 520−21; *see* Pls.' Exh. 75, slide 6.

Unum contended that its RAAs most resembled not money market mutual funds, but rather bank checking accounts and/or bank money market accounts. Tr. 2 at 468−471. Unum presented evidence that, as reported by the Bank Rate Monitor National Index (BRMNI), the average rate of interest credited by banks on interest-bearing checking accounts and on bank money market accounts always fell below the 1% interest rate set by Unum on its RAAs. Def.'s Exh. 43. The highest average rate of interest credited by banks on interest-bearing checking accounts in the class

period was .32% in September of 2006. *Id.* The highest average interest rate on bank money market accounts was .93%, credited during certain weeks in August and September of 2007, and for one week in January of 2008. *Id.* Rates on both types of accounts fluctuated through 2008 but began almost without exception a gradual, steady decline from 2009 through the end of 2012. *Id.* As of October 2012, the average credited rate for bank money market accounts was .11%, and for checking accounts was .05%. *Id.*

Checking accounts are designed to be used for everyday transactions. RAAs are liquid, but because they cannot be used for any transaction under $250, they do not function like checking accounts.  In this regard, RAAs function more like money market accounts.

### G.      State Guaranty Association Insurance

Unum asserts that RAAs are insured through state insurance guaranty associations, sometimes up to $500,000. Tr. 3 at 469−71, 498−99, 607. Insurance companies are regulated by the states, and each state has an insurance guaranty association formed for the purpose of protecting insureds should their insurer become insolvent. If an insurer becomes insolvent, the state is empowered to take control of the company in a receivership, and the company is either rehabilitated or liquidated. The role of the guaranty association is to pay any benefits due to insureds that cannot be paid out of the insolvent insurer's own assets. *See*, *e.g.,* 24-A M.R.S.A. §§ 4351−4407 (Maine Insurance Rehabilitation and Liquidation Law);

24-A M.R.S.A. §§ 4431−4452 (Maine Insurance Guaranty Association Act); 24-A M.R.S.A. §§ 4601−4619 (Maine Life and Health Insurance Guaranty Association Act).

Whether RAAs are covered by state guaranty associations is a question of law analyzed below. But the practical worth of state guaranty association insurance coverage is a question of fact. The experts agreed that payment by the FDIC on insured bank accounts is swift and provides complete coverage up to $250,000 per account, and Unum's experts did not deny that payment from a state guaranty association could take months if not years to process. Tr. 2 at 400, 402, 404; Tr. 3 at 587−589, 595. For this reason, the Court finds that what coverage may have been available for RAAs through the state guaranty associations was less valuable than FDIC insurance.

## III.   CONCLUSIONS OF LAW

The question now before the Court is how to measure the damages, if any, that arose out of Unum's breach of its duty under 29 U.S.C. § 1104(a) to set interest rates on its RAAs solely in the interest of the Plaintiff beneficiaries.

### A.   The Standard

The Court has little guidance in making this determination. Under *Mogel v. UNUM Life Ins. Co. of Am.*, 547 F.3d 23, 26 (1st Cir. 2008), Unum's fiduciary duties under ERISA section 404(a) extend until the funds are withdrawn from the RAAs. But the fiduciary duties as described in section 404(a) appear to be written for plan investment managers, rather than administrators of RAAs. In attempting to craft

the appropriate fiduciary duties for an institution offering ERISA-governed RAAs, the Court borrows the "prudent man standard" from section 404(a) which provides, in pertinent part, that an ERISA fiduciary:

> shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . .

29 U.S.C. §1104(a). The Court also turns for guidance to the cases involving the fiduciary duties of ERISA investment managers.[12]

Although Unum was not placing the RAAs with a third party, using the "prudent investor" analogy, the Court concludes that Unum's discretion in setting the interest rate on its RAAs nevertheless required it to "investigate the merits" of the proposed rate, and imposed a fiduciary obligation to provide a rate of interest

---

[12]    In cases such as *California Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1043 (9th Cir. 2001), the primary question in applying the prudence rule is "whether the fiduciaries, 'at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.'") (quoting *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983)).

    The Court also considered the "excessive fee" cases in attempting to find a way to assess the interest rates credited to RAAs. *See Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,* 694 F.2d 923, 928 (2d Cir. 1982) and its progeny. Under these cases, fiduciaries do not have an obligation to negotiate the "best deal" possible for beneficiaries, but rather, only to ensure that the fee charged for managing the beneficiaries' money is not "so disproportionately large that it bears no reasonable relationship to the services rendered . . . ." *Id.*, *see also Young v. GM Inv. Mgmt. Corp.*, 325 Fed. Appx. 31, 33 (2nd Cir. 2009) (unpublished) (applying this standard, which originated as part of fiduciary duties imposed by the Investment Company Act, to ERISA). The Court ultimately rejects this standard for the same reason it finds Model 1 irrelevant. The excessive fee cases address what is an acceptable fee for management of other people's investments under a statutory fiduciary framework. But in this case, Unum's spread is not a fee for services rendered, but a result of investments it made on its own account with money it was permitted to retain. Unum correctly points out that it bears the risk of these investments, so the gain realized on Unum's investments cannot reasonably be described as a "fee," nor can the gain be examined for "reasonableness" because it was not guaranteed but depended on market performance and the wisdom of Unum's investments. Had Unum lost money on its investments, it still would have been required to pay the benefits due when the beneficiaries presented their drafts.

15

that was competitive with products that had a risk profile and features equivalent to Unum's RAAs.

## B.    Risks and Features of Unum's RAAs

The Court has already determined as a matter of fact that Unum's RAAs are not identical to bank checking accounts because those accounts are more flexible than RAAs. The Court considers bank money market accounts and money market mutual funds to be closer cousins to RAAs than checking accounts.

The parties disagree as to whether the RAAs are more like bank money market accounts or money market mutual fund accounts, and the argument is based primarily on an analysis of the investment risk. Unum contends that there is no difference in risk between its RAAs and bank money market accounts because, for both accounts, the risk of any investment made with funds backing these accounts is borne by the institution and not by the customer or beneficiary. Since money market mutual funds place the investment risk on the individual, Unum contends that they are not a useful comparison.

The Plaintiffs point out that bank money market accounts offer FDIC insurance, whereas beneficiaries bear the risk of the insurance company's insolvency. Therefore, Plaintiffs contend that bank money market accounts are not a useful comparison to the RAAs. Unum responds that insolvency risk should not trouble the Court because: (1) Unum did not become insolvent during the class period, (2) RAAs are covered by state insurance guaranty associations and (3) Unum's financials are strong.

### 1.      Unum's Solvency

The fact that Unum never became insolvent is irrelevant because, in setting damages, the Court engages in a forward-looking analysis. *See, e.g., DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 424 (4th Cir. 2007) ("whether a fiduciary's actions are prudent cannot be measured in hindsight . . ."); *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 918 (8th Cir. 1994) ("[T]he prudent person standard is not concerned with results; rather it is a test of how the fiduciary acted viewed from the perspective of the time of the challenged decision rather than from the vantage point of hindsight." (internal quotation marks omitted)). At the time the Plaintiffs were provided with RAAs, there was a risk of insolvency that Unum was required to recognize.

### 2.      Insurance Coverage for RAAs

The Court also rejects Unum's second contention, that its risk of insolvency was immaterial because of state insurance guaranty association coverage. The legal status of RAAs is in flux and varies by state. Since 2010, there has been a flurry of activity regarding coverage of RAAs by state insurance guaranty associations.

In about 2010, the National Association of Insurance Commissioners (NAIC) suggested to state insurance commissioners that they require insurers to disclose information about RAAs including that insurance companies are not guaranteed by the FDIC but are governed by "State Guaranty Associations." Def.'s Exh. 39. Nine state insurance commissioners took up this suggestion and sent out bulletins to

insurers directing them to make RAA disclosures.[13] In Connecticut, the disclosure is required to state that RAAs "*may* be guaranteed by the state life and health insurance guaranty associations" (emphasis added), and in West Virginia, the disclosure is required to state that RAAs "are guaranteed, subject to certain limitations, by the respective state guaranty association." Prior to this, only one state, Kansas, had a state bulletin requiring RAA disclosures, and this bulletin required insurers to provide:

> a written explanation of what the limit of protection is for the retained asset account under the Kansas Life and Health Insurance Guaranty Association Act. It should also disclose that a lengthy delay is possible before a beneficiary can get the proceeds if insolvency occurs.

Ks. Ins. Bulletin No. 1995-22, 1995 WL 17800855 (Dec. 8, 1995). Unum has not pointed the Court to any further pronouncements, direct or indirect, by any other state insurance commissioners, to the effect that RAAs are covered by state guaranty associations.

Unum did introduce two statements from the National Organization of Life and Health Insurance Guaranty Association (NOLGHA).[14] The first was a July 29, 2010 statement that asserted that all state guaranty associations will cover RAAs up to at least $250,000. Def.'s Exh. 25. The second was a 2011 fact sheet about

---

[13] Co. Dep't of Reg. Agencies, Div. of Ins. Bulletin No. B-4, 12 (April 29, 2011) (amended and reissued); Ct. Ins. Dep't Bulletin IC-27 (Feb. 3, 2011); Il. Dep't of Ins. Co. Bulletin 2011-03 (Dec. 12, 2011) (revised); Ia. Ins. Dep't Bulletin 11-01 (Feb. 8, 2011); Me. Bureau of Ins. Bulletin 376 (Jan. 24, 2011); N.H. Ins. Dep't Bulletin Ins. No. 10-046-AB (Dec. 21, 2010); NJ Ins. Order No. A11-101, 2011 WL 70388 (Jan. 5, 2011); Oh. Dept. of Ins. Bulletin 2011-01 (Jan. 3, 2011); W.V. Off. of Ins. Comm'r Informational Letter No. 178A (May, 2011).

[14] NOLGHA is a voluntary organization that concerns itself with setting policy and making recommendations regarding state law governing and affecting state insurance guaranty associations. NOLGHA does not create law, but its recommendations may be looked to as persuasive authority by state insurance commissioners and other decisional authorities. Tr. 3 at 644−46.

RAAs in which NOLGHA asserted that, "[g]enerally speaking, RAAs are provided guaranty association coverage on the basis that they represent a death benefit under a covered life insurance policy." Def.'s Exh. 24. Whether NOLGHA's interpretation of state law is correct is up for debate.

NOLGHA views RAAs as "death benefits" and thus presumably included under the various states' statutory coverage of group life policies. But Unum essentially argues that RAAs are not death benefits but the proceeds of death benefits. This stems from their position that RAAs are "supplemental contracts." Under this view, a claim is approved and then "paid" under the policy/plan by the establishment of an RAA. The insurer's obligation to pay the death benefit under the plan is discharged with the creation of the RAA, which is thereafter governed by the supplemental contract.

As of 2010, only six states clearly covered group life supplemental contracts.[15] But in the past three years, twelve additional states have amended their statutes to explicitly cover group life supplemental contracts.[16] There appears to be at least some movement by states both to categorize RAAs as supplemental contracts and also to make sure guaranty association coverage is provided for them, but the movement is of recent vintage.

---

[15]   *See* Alaska Stat. § 21.79.020, Colo. Rev. Stat. § 10-20-104, Mass. Gen. Law ch.175 § 146B, Mich. Comp. Laws §500.7704, N.J. Rev. Stat. § 17B:32A-3, Wis. Stat. § 646.01.

[16]   *See* 2012 Ala. Laws Act 2012-319 (H.B. 403), 2013 Ariz. Legis. Serv. Ch. 214 (H.B. 2546) (West), 2013 Ark. Laws Act 456 (S.B. 464), 2012 Ga. Laws Act 668 (H.B. 786), 2012 Hawaii Laws Act 250 (S.B. 2767), 2011 Idaho Laws Ch. 196 (S.B. 1090), 2012 Md. Laws Ch. 634 (H.B. 1340), 2011 Mont. Laws Ch. 27 (S.B. 78), 2012 N.M. Laws Ch. 9 (S.B. 47), 2011 N.D. Laws Ch. 220 (S.B. 2111), 2013 Or. Laws H.B. 3458 (West's No. 701), 2013 S.D. Laws Ch. 252 (HB 1102).

At the same time, courts have only begun to address the question of the status of RAAs. The Second and Third Circuits have essentially taken the position that RAAs are supplemental contracts. *See Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 105 (2d Cir. 2011) ("To the extent MetLife remained obligated to honor the account holder's 'checks' and pay interest at a guaranteed rate, we believe that this arrangement constituted a straightforward creditor-debtor relationship governed by the Customer Agreements and state law, not ERISA."); *Edmonson v. Lincoln Nat'l Life Ins. Co.*, ___ F.3d ___, No. 12-1581, *14, 2013 WL 400755312 (3d Cir., August 7, 2013) (same, citing *Faber*). This view undermines NOLGHA's assertion that RAAs are covered by the state guaranty associations. Either RAAs are approved but as-yet unpaid death benefits under group life policies—in which case they may be covered by the state guaranty associations' coverage of group life policies—or they are the proceeds of already-paid death benefits, rolled over into an RAA and governed by a supplemental contract, in which case only seventeen states unambiguously provide the requisite coverage.

The First Circuit rejected the contention that funds in an RAA should be "deemed to belong" to a beneficiary until the beneficiary actually draws a check on an RAA. Mogel, 547 F.3d at 26. This is essentially the view that RAAs are approved, but as-yet-undistributed death benefits. Under this view, the prospect of across-the-board state guaranty association coverage for RAAs is much stronger. But the fact remains that, at present, and certainly during the class period, there is no definitive

answer regarding the status of RAAs, or, consequently, any reasonable assurance that the Plaintiffs' RAAs were covered by state guaranty association insurance.

### 3.    Strength of Unum's Financials

Finally, Unum contends that the Court should not be troubled by its insolvency risk because Unum's financials are strong. Unum's financials were strong throughout the class period, and thus, the risk of loss to beneficiaries in leaving their funds in Unum's RAAs was overall quite low even though Unum has not shown that its liabilities were guaranteed by its parent, Unum Group.[17] But the risk of loss to investors in a money market mutual fund is also quite low. Unum was only able to cite one fund that ever "broke the buck."

In sum, the risk profile of Unum's RAAs was somewhere between that of money market mutual funds, as very low-risk investments, and money market bank accounts, essentially no-risk savings products insured by the FDIC.[18] Indeed, this was where defense expert Dr. Bruce Stangle placed RAAs on a risk-return graph he had created. Def.'s Exh. 64, Slide 001B. Given that the RAA's risk profile fell between these two products, the Court concludes that an appropriate interest rate

---

[17]    No assumptions can be made about a parent company's liability for its subsidiary's debts. *See, e.g.*, J.A. Bryant, Jr., *Liability of Corporation for Contracts of Subsidiary*, 38 A.L.R. 1102 § 2[a] (1971) ("It is clear that parental liability is not the norm, yet it may exist in a proper case.").

[18]    The interest-rate-setting parameters adopted in this opinion do not necessarily apply to every ERISA insurer. It may not be appropriate, for example, for an insurer with a different claims-paying ability rating or with different features in its RAAs to determine its crediting rate by simply adopting the average of the two index rates used in this case. Unum argued that an interest-rate-setting method that provides no certainty is fundamentally inconsistent with ERISA's efficiency, predictability, and uniformity concerns and would subject insurers to a new class of unheard-of litigation. *See Conkright v. Frommert*, 559 U.S. 506, 519 (2010), *Pegram v. Hedrich*, 530 U.S. 211, 237 (2000).  But the very fact that discretion is involved in Unum's rate-crediting decisions means that Unum's compliance with its fiduciary duties is not reducible to some nondiscretionary formula. If Unum or any other insurer wishes to take itself out of the fiduciary business of setting RAA interest rates, it may set its formula for determining RAA interest-rate in advance within the policies it sells.

would be the average of the prevailing annual rate credited on money market mutual funds and the prevailing annual rate credited on money market bank accounts throughout the class period. To the extent this average rate exceeded the 1% credit rate offered by Unum during any given year, the difference would measure the damages to the Plaintiffs.[19]

## C.    Calculating Damages

Having settled on a method for calculating an appropriate interest rate, the Court turns to the calculation of damages.

Unum presented testimony that there are indices that track both money market bank account interest rates and money market mutual fund returns, specifically, the BRMNI index for bank money market accounts, and the Lipper index for money market mutual funds. While Unum supplied BRMNI figures, neither party offered into evidence the historical rates of return for money market mutual funds as reported by the Lipper index. Instead, the Plaintiffs offered into evidence the rates of return of the Vanguard Prime and Fidelity Cash Reserves money market mutual funds. Unum objected to the cherry-picking of two funds. Thomas McAvity testified on cross-examination that he chose the Vanguard and Fidelity funds because they were familiar, and he conceded that it would be reasonable to look at more funds.

The Lipper index provides a more comprehensive and therefore more reliable index for measuring money market mutual fund returns.  The Court finds that the

---

[19]    In 2004 and 2009-1012, the 1% rate credited by Unum exceeded the average. While Unum was entitled to pay its beneficiaries more than this average, it is not entitled to a set off for having done so.

Lipper index, rather than an average of two funds hand-picked by the Plaintiffs, is the appropriate benchmark, averaged with the BRMNI index, for setting damages. At oral arguments following trial, the Court gave the parties an opportunity to be heard on the question of whether the Court may take judicial notice of the Lipper index under Federal Rule of Evidence 201(b)(2), *see Lussier v. Runyon*, 50 F.3d 1103, 1114 (1st Cir. 1995). Subsequently, the Court issued an order requesting that the parties submit agreed-upon Lipper index figures (ECF No. 157). The parties then submitted average annual returns for money market mutual funds during the class period.[20] Averaging the annual money market mutual fund index returns with the annual money market bank account index rates,[21] and subtracting the one-percent rate credited by Unum throughout the class period, the Plaintiffs experienced a shortfall in the interest rate credited to their RAAs in class years 2005 through 2008 as follows: in 2005, .6565%; in 2006, 1.652%; in 2007, 1.8115%, and in 2008, .5635%.

According to Unum, 36.577% of its RAAs are not ERISA-governed, and are therefore not subject to this suit. RJSF ¶ 39. At trial, Unum pointed out that this percentage, which the Plaintiffs used to calculate their dollar damages, referred to the number of RAA accounts governed by ERISA and not to the actual dollar amounts governed by ERISA. Tr. 2 at 423−26. This defect is not fatal to the

---

[20]     The Lipper index figures provided by the parties were: in 2004, 1.24%; in 2005, 2.66%; in 2006, 4.51%; in 2007, 4.77%; and in 2008, 2.41%. In 2009−2012, the Lipper Money Market Index was always below 1%. Joint Submission Regarding Lipper Index Information (ECF No. 160).
[21]     For class years 2004 through 2008, the average annual interest credited on money market bank accounts was: in 2004, .51%; in 2005, .653%; in 2006, .794%; in 2007, .853%; and in 2008, .717%. In class years 2009−2012, the interest credited to money market bank accounts remained below 1%. Def.'s Exh. 43.

Plaintiffs' case. *See, e.g., Sec'y of U.S. Dep't of Labor v. Gilley*, 290 F.3d 827, 830 (6th Cir. 2002) (joining the Second, Eighth, and Ninth Circuits in holding that any ambiguity in determining the amount of loss in an ERISA action should be resolved against the breaching fiduciary); *N.Y. State Teamsters Council Health and Hosp. Fund v. Estate of DePerno*, 18 F.3d 179, 182 (2d Cir. 1994) (an ERISA case, borrowing from the law of trusts: "Where a person has wrongfully mingled trust funds with his own, the burden is on him to show how much of the mingled fund is his own . . . .") (quoting 5 Austin W. Scott & William F. Fratcher, Law of Trusts § 515, at 609 (2d ed. 1989)),

Unum asserts that the Plaintiffs bear the burden of proof on damages. As recently noted by the Supreme Court in *CIGNA Corp. v. Amara*, 131 S.Ct. 1866, 1881 (2011), "a fiduciary can be surcharged under § 502(a)(3) only upon a showing of actual harm—proved (under the default rule for civil cases) by a preponderance of the evidence." But *Amara* is not inconsistent with *Gilley* or *DePerno*, which deal not with the plaintiff's burden to show harm, but with quantifying the harm that has been shown. The Plaintiffs met their burden under *Amara* of showing harm by showing that Unum failed during part of the class period to credit a sufficient rate of interest to their RAAs. Unum wishes to limit the calculation of damages by asserting that a portion of its RAA funds were not subject to ERISA. It is Unum's burden to provide evidence of this. *See Gilley,* 290 F.3d at 829−30; *DePerno*, 18 F.3d at 182. This is especially true where Unum is the party in possession of the information necessary to satisfy this issue. *Cf. Central Pension Fund of Int'l Union*

*of Operating Engineers and Participating Emp'rs v. Ray Haluch Gravel Co.*, 695 F.3d 1, 10 (1st Cir. 2012) ("an employer should not 'be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records [as required]'" (quoting *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 688 (1946)).

Since Unum provided no numbers to impeach the 36.577% figure used by the Plaintiffs, the Court uses this figure in its calculation of damages. Using this figure, the following amount of RAA funds were subject to ERISA during each year of the class period: in 2005, $313,626,735; in 2006, $272,211,516; in 2007, $237,392,289 and in 2008, $225,849,303. Multiplying the total RAA dollars subject to ERISA by the shortfall rate, the dollar amount of the Plaintiffs' damages per year in class years 2005 through 2008 are: in 2005, $2,058,960; in 2006, $4,496,934; in 2007, $4,300,361; and in 2008, $1,272,661. Total damages are $12,128,916.

### D.     Prejudgment Interest

The Plaintiffs have requested, and Unum has not argued against, an award of prejudgment interest. The Court in this ERISA case has discretion to grant prejudgment interest. *Cottrill v. Sparrow, Johnson & Ursillo, Inc.*, 100 F.3d 220, 223 (1st Cir. 1996), *abrogated on other grounds by Hardt v. Reliance Std. Life Ins. Co.*, 560 U.S. 242 (2010). The purpose of prejudgment interest is the remedial objective of making the beneficiary whole for the period during which the fiduciary withholds money legally due. *Id.* at 224. ERISA contains no explicit provision for

prejudgment interest, so a court that elects to award prejudgment interest in an ERISA case has broad discretion in choosing a rate. *Id.* at 224−25.

The Court exercises its discretion to award prejudgment interest to the Plaintiffs per calendar year for the total amount of damages accrued during that year, at the average annual rate for the one-year constant maturity (nominal) Treasury yield, as published by the Federal Reserve System. This rate is similar to the post-judgment interest rate specified under the federal post-judgment interest statute, 28 U.S.C. § 1961. The applicable rates during the class period are: in 2005, 3.62%; in 2006, 4.94%; in 2007, 4.53%; in 2008, 1.83%; in 2009, .47%; in 2010, .32%; in 2011; .18%, and in 2012; .17%.[22] For 2013, where the annual rate is not yet available, the Court selects as the prejudgment interest rate the same rate applicable for post-judgment interest under 28 U.S.C. § 1961, which is .16%. Accordingly, pre-judgment interest is awarded as follows: for 2005, $74,534; in 2006, $323,861; in 2007, $491,788; in 2008, $221,959; in 2009, $57,006; in 2010, $38,813; in 2011, $21,832; in 2012, $20,619; and in 2013, $13,578.[23] Total prejudgment interest is $1,263,990.

---

[22]     Rates available at http://www.federalreserve.gov/releases/h15/data.htm.

[23]     Based on the following calculations: for 2005, $2,070,044 x 3.62%; in 2006, $6,561,862 x 4.94%; in 2007, $10,858,188 x 4.53%; in 2008, $12,122,778 x 1.83%; in 2009, $12,122,778 x .47%; in 2010, $12,122,778 x .32%; in 2011, $12,122,778 x .18%, in 2012, $12,122,778 x .17%; and in 2013 $12,122,778 x .16% x .70 (prejudgment proportion of 2013 as of Wednesday, September 11, 2013).

## **CONCLUSION**

For the reasons stated, the Court awards $12,128,916 in damages to the Plaintiffs plus prejudgment interest in the amount of $1,263,990.

SO ORDERED.

Dated this 9th day of September, 2013.

/s/ Nancy Torresen
United States District Judge